UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-against-

NARAY PALANIAPPAN,

                Defendant.

**MOTION TO DISMISS THE INDICTMENT**

15 Cr. 485 (FB)

In order to investigate this case, the government committed tens of thousands of crimes against vulnerable child victims of sexual abuse. It distributed countless pictures and videos from a government-controlled server to consumers of child pornography, effectively, in its own view, re-victimizing the children depicted in those images. These images would not have been redistributed if the government had not sent them out to customers of its website. It would be unthinkable to commit an equal number of physical assaults in order to capture even a violent criminal. *See U.S. v. Archer*, 486 F.2d 670, 676-77 (2d Cir. 1973). Under our law, the pain caused by re-distribution of child pornography is akin to physical assault. The government's conduct in this case was, therefore, outrageous

and so unprecedented that the only remedy adequate to deter such misconduct in the future is dismissal of the instant indictment.

Accordingly, defendant Naray Palaniappan hereby moves pursuant to Rule 12(a)(3) of the Federal Rules of Criminal Procedure and the Court's supervisory powers for an order dismissing the indictment in this case, with prejudice, based on outrageous governmental conduct. Specifically, this motion arises from the government's distribution of child pornography via a website called Play Pen between February 20, 2015, and March 4, 2015, which initiated the investigation leading to the charges against Mr. Palaniappan. The government's distribution of contraband in connection with this case was lawless, harmful, unjustified and inexcusable. The government's investigation resulted in concrete injuries to thousands of children depicted in the pictures it distributed—injuries that would not have happened if the government had not itself entered into the child pornography business. Such government conduct offends common standards of decency. Accordingly, the Court can and should dismiss the indictment.[1]

## FACTS

Between February 20, 2015, and March 4, 2015, the government distributed images of child pornography to approximately 100,000 users on a website called

---

[1] We do not expect the government to dispute any of the basic facts relating to the Play Pen investigation set forth herein. To the extent the government denies its conduct was outrageous, however, we request a hearing with full discovery in order to resolve the dispute.

2

"Play Pen" which was operating under FBI control. Based on the information supplied by the government in its response to an order compelling discovery, filed in the related case *United States v. Michaud*, No. 15-CR-5351 (W.D. Wash.), and attached hereto as Exhibit A, the number of images distributed during that time period could be in the hundreds of thousands. *See* Ex. A at 1-4. The purpose of this widespread distribution of dangerous, humiliating, offensive, and illegal material was to identify and prosecute Play Pen users, including, allegedly, Mr. Palaniappan.

Prior to February 20, 2015, the Play Pen website was operated by a private citizen out of North Carolina and operated on a server where users posted and exchanged child pornography. *See* Ex. B: Search Warrant and Supporting Affidavit (hereinafter "NIT Warrant") ¶ 28. In January 2015, the government seized the Play Pen server and installed a copy of it on a government computer in the Eastern District of Virginia. *Id.* On February 20, the government obtained a warrant to take control of and operate the Play Pen website for up to 30 days from the Virginia location. *See* Ex. B. Included in the signed warrant is authorization to use government software to capture a user's computer data at the time of login. Ex. B at 26.[2]

---

[2] At least two courts have found that this warrant was not valid outside Virginia and thus was void *ab initio*. *See U.S. v. Levin*, -- F.Supp.3d --, 2016 WL 2596010 at *15 (D. Mass. May 5, 2016) (appeal pending) (warrant authorizing search of Play Pen user outside Virginia was void *ab initio* and therefore all fruits of the warrant were suppressed).

3

During the 13 days that the government operated Play Pen, approximately 100,000 "unique user accounts" logged onto the website for approximately one million logins. Ex. A at 4. These users clicked on approximately 67,000 "unique links" on the site that took them to "archives containing multiple image or video files of child pornography, or to particular image files depicting child pornography." Ex. A at 3. The government took no steps to prevent the users from viewing or downloading any of the illicit content on the site, but continued to operate the site knowing that thousands of images of child pornography were being traded and shared among thousands of people. Ex. A at 4-7. Although the government admits that approximately 100,000 user accounts accessed Play Pen while it was under the government's control, as of January 2016, only 137 users had been charged in connection with the investigation. Ex. A at 4, 7.

## ARGUMENT

**The indictment should be dismissed because the government's operation of the Play Pen website and its global distribution of an untold number of images of child pornography constitutes outrageous conduct.**

An act of governmental conduct may be so outrageous as to warrant dismissal of the indictment against the defendant as a violation of the defendant's Fifth Amendment right to Due Process. *See U.S. v. Al Kassar*, 660 F.3d 108, 121 (2d Cir. 2011); *see also U.S. v. Schmidt*, 105 F.3d 82, 91 (2d Cir. 1997)

---

Other courts have denied suppression. In the event the indictment is not dismissed, Mr. Palaniappan intends to move to suppress all fruits of the illegal warrant.

4

("Sometimes the government's involvement in manufacturing crime is demonstrably outrageous, and in those cases, the convictions of targeted defendants have been set aside."). The focus of the inquiry is on the conduct of the government agents. *Id.*; *see also United States v. Viera*, No. 14-CR-83, 2015 WL 171848, at *3 (S.D.N.Y. Jan. 14, 2015). Whether governmental conduct is outrageous "turn[s] on whether the governmental conduct, standing alone, is so offensive that it 'shocks the conscience[.]'" *U.S. v. Chin*, 934 F. 2d 393, 398 (2d Cir. 1991), citing *Rochin v. California*, 342 U.S. 165 (1952). In the Second Circuit, "there is certainly a limit to allowing governmental involvement in crime." *U.S. v. Archer*, 486 F.2d 670, 676 (2d Cir. 1973). Of particular concern are cases where "the Government supplies contraband, or becomes intimately involved in its production…[or] the Government misconduct injures third parties in some way." *United States v. Thoma*, 726 F.2d 1191, 1199 (7th Cir. 1984) (citations omitted). While findings of outrageous conduct are rare, the proper remedy is dismissal of the indictment pursuant to the Due Process Clause of the Fifth Amendment of the United States Constitution. *See U.S. v. Longo*, 70 F.Supp.2d 255, 270 (W.D.N.Y. 1999), *citing U.S. v. Cuervelo*, 949 F.2d 559, 565 (2d Cir. 1991) ("to obtain dismissal of an indictment based upon a claim of outrageous governmental conduct, a defendant must establish that the government engaged in outrageous

5

behavior in connection with the alleged criminal events and that due process considerations bar the government from prosecuting her.").

Although some governmental involvement in criminal activity in a sting operation is permitted, in this case the government far exceeded the limitations on acceptable conduct by re-victimizing the children depicted in child pornography images that were distributed while the Play Pen website operated under the government's control. For example, in a drug sting operation, "the gathering of evidence of past unlawful conduct frequently proves to be an all but impossible task." *United States v. Russell*, 411 U.S. 423, 432 (1973). Thus, limited participation by law enforcement to infiltrate a drug ring "is a recognized and permissible means of investigation; if that be so, then the supply of some item of value that the drug ring requires must, as a general rule, also be permissible. For an agent will not be taken into the confidence of the illegal entrepreneurs unless he has something of value to offer them. Law enforcement tactics such as this can hardly be said to violate 'fundamental fairness' or be 'shocking to the universal sense of justice.'" *U.S. v. Russell*, 411 U.S. 423 (1973) (citation omitted). But in *United States v. Archer*, the Second Circuit cautioned,

> Governmental 'investigation' involving participation in activities that result in injury to the rights of its citizens is a course that courts should be extremely reluctant to sanction. Prosecutors and their agents naturally tend to assign great weight to the societal interest in apprehending and convicting criminals; the danger is that

6

> they will assign too little to the rights of citizens to be free from government-induced criminality.

*U.S. v. Archer*, 486 F.2d at 677. In this case, the government assigned too little weight to the rights of the children in the images it was distributing. The harms associated with child pornography have been well known for decades. This Court need only consider the government's own pronouncements about the evil of the proliferation of child pornography to realize how troubling the government's operation is. While the defense does not necessarily agree with some of the government's more extreme statements about the impact of downloading or distributing illicit pictures, it is impossible to reconcile the government's distribution of child pornography with its own view of the destruction caused by such distribution. The website of the U.S. Department of Justice ("DOJ") informs the public that every time someone looks at child pornography, the victim in the image is re-victimized:

> [V]ictims of child pornography suffer not just from the sexual abuse inflicted upon them to produce child pornography, but also from knowing that their images can be traded and viewed by others worldwide. Once an image is on the Internet, it is irretrievable and can continue to circulate forever. The permanent record of a child´s sexual abuse can alter his or her li[f]e forever. Many victims of child pornography suffer from feelings of helplessness, fear, humiliation, and lack of control given that their images are available for others to view in perpetuity.

7

DOJ, *Child Pornography*, *available at* www.justice.gov/criminal-ceos/child-pornography. The DOJ also has repeatedly emphasized that possessing and circulating pornographic images re-victimizes the children depicted in them. *See, e.g.,* DOJ Press Release, *Ellettsville Man Charged with Production of Child Pornography*, April 15, 2015, *available at* https://www.justice.gov/usao-sdin/pr/ellettsville-man-charged-production-child-pornography ("Producing and distributing child pornography re-victimizes our children *every time* it is passed from one person to another.") (emphasis added); FBI Press Release: *Defendant Sentenced for Possession of Child Pornography*, November 5, 2013, *available at* https://www.fbi.gov/atlanta/press-releases/2013/defendant-sentenced-for-possession-of-child-pornography (justifying 108-month sentence for possession of child pornography on ground that defendant "caused the young children in these disgusting images to be re-victimized *every time* he looked at the pictures") (emphasis added).

The Supreme Court acknowledged these principles more than three decades ago in *New York v. Ferber*, 458 U.S. 747, 759 (1982) (child pornography is "a permanent record of the children's participation and the harm to the child is exacerbated by [its] circulation."). In 2015, the DOJ Internet Crimes Against Children Task Force program received over $27 million in funding to help state and local law enforcement agencies combat "the proliferation of child sexual abuse

8

images available electronically," the same proliferation of images perpetrated by the government here. DOJ, Program Summary, *available at* http://www.ojjdp.gov/programs/ProgSummary.asp?pi=3. If individual victims are re-victimized every time an offender looks at a picture, how can the government possibly justify distributing tens of thousands of pictures to a hundred thousand offenders, many of whom would never see the pictures without the help of the government?

    The government has acknowledged the risks involved in executing an online sting operation. *See* DOJ Online Investigations Working Group, *Online Investigative Principles for Federal Law Enforcement Agents* (1999), available at https://info.publicintelligence.net/DoJ-OnlineInvestigations.pdf. Not only is it "difficult to control distribution…and so limit the harm that may arise," but there may be "national and international repercussions." *Id.* at 44. While investigating people in other jurisdictions from the United States can itself be problematic, "investigating people located in other countries raises far more sensitive international concerns, particularly if the operation results in harm to third-party victims abroad." *Id.* at 46.

    In the sting operation at issue in this case, both of these concerns are implicated. It is beyond dispute that the government re-victimized an untold number of third-party victims when it chose to operate the Play Pen website and distribute thousands of images of child pornography to any of the 100,000 users

9

who accessed the website from all over the world. *See U.S. v. Levin*, -- F.Supp.3d --, 2016 WL 2596010 at *15, f.n. 12 (D. Mass. May 5, 2016) (in Play Pen investigation, "the government disseminated the child obscenity to catch the purchasers"). And the extent to which those images were further disseminated by those users is unknown. Moreover, the government did not have to distribute the images of the child pornography victims in order to learn the identity of the website users since the software to obtain the user's computer information functioned at the time the user logged onto the Play Pen website. Ex. B at ¶ 33. But rather than intercept the users' access to the images in some way, which the government was capable of doing, the government sent the images to the 100,000 active users who were then free to save and re-distribute them, further victimizing the child victims with each iteration. *See* Ex. C: *U.S. v. Arterbury*, No. 15-CR-182 (N.D. Okla. April 25, 2016), ECF No. 42: Report and Recommendation at 27 (rejecting government's argument in related case claiming "exigent circumstances" in opposition to motion to suppress, holding "[t]he Government cannot assert exigent circumstances when it had a hand in creating the emergency").

The Second Circuit addressed outrageous government conduct in a child pornography case in *United States v. Chin*, 934 F.2d 393 (2d Cir. 1991). In that case, an undercover postal inspector wrote to the defendant and encouraged him to bring back child pornography when he traveled to Amsterdam. He did so and was

arrested. The Second Circuit held that although the defendant's due process rights were not violated – he was not forced to go to Amsterdam or to bring back the illegal material – the case raised "very serious concerns with respect to the rights of third parties, namely, the rights of the children Congress sought to protect in enacting the prohibitions on child pornography." *Id*. at 399. The Court continued:

> Our concern is that, in contrast to the usual sting operation, in which the Government set up a phony drug transaction or another sort of dummy crime, the government agent in this case encouraged [the defendant] to go out and commit a *real* crime, with *real* victims, just so [the defendant] could later be arrested and prosecuted.

*Id.* Ultimately, though, the *Chin* court did not grant relief to the defendant because there was no proof that "the governmental action actually caused the defendant to commit a crime that would otherwise not have been committed." *Id*. at 400. But the government has no such excuse here: while in *Chin* the agent encouraged the defendant to commit a distinct crime (the importation of illegal magazines from Amsterdam), in this case the government *itself* committed the crimes by distributing the child pornography to the defendant. In so doing, the FBI not only failed to heed the *Chin* court's advice to "think twice before engaging in investigative techniques that encourage individuals to commit actions that harm innocent third parties[,]" *id.,* but in fact actively committed the crimes that hurt the third parties. The harm caused was so severe, widespread and pervasive that the

11

government must not be allowed to benefit from its misconduct by continuing a prosecution derived from evidence so obtained.

Since *Chin* was decided, child pornography laws have evolved on both the state and federal level. In particular, in 2006, the Adam Walsh Child and Safety Protection Act (the "AWA") was signed into law, enacting many provisions to ensure that children are not re-victimized by unnecessary distribution of pornographic images. Pub. L. 109-248, 120 Stat. 587 (July 27, 2006). In a criminal case, the AWA prohibits the government from disseminating any child pornography outside of the care of the government or the court. *Id.*; 18 U.S.C. § 3509(m). Defense attorneys are also prevented from obtaining copies of child pornography even for purposes of representing their clients. *Id.*

Yet in this case, the government made the decision to operate the Play Pen website, originally for up to 30 days, despite knowing the significant harm that would result from the inevitable sharing and redistribution of the child pornography images; despite knowing that the jurisdiction of any number of the website users could fall outside of the federal government's jurisdiction to prosecute; and despite a decade-old federal law that prohibits the government from distributing child pornography that comes under its control to anyone other than a court. This is the rare case where the federal government's conduct shocks the

conscience and the only viable remedy is dismissal. *U.S. v. Archer*, 486 F.2d at 677.

## CONCLUSION

Because the government re-victimized thousands of child victims in the course of its investigation, its conduct shocks the conscience and the Court should dismiss this case to deter future such violations.

        Dated:    New York, New York
                        September 16, 2016

        Respectfully submitted,
        Law Office of Zachary Margulis-Ohnuma

        By: /s/_____
        Zachary Margulis-Ohnuma
        260 Madison Avenue, 17th Fl.
        New York, NY 10016
        (212) 685-0999